AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin


CLERK'S OFFICE
A TRUE COPY
Feb 22, 2021
s/ JeremyHeacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Zachary Waite<br>DOB: xx/xx/1999 | ) ) ) ) ) | Case No. **21-M-332 (SCD)** |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __4/1/2018 through 12/18/2019__ in the county of __Milwaukee__ in the __Eastern__ District of __Wisconsin__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. §§ Sections 2(a), 922(g), 924(c) and Title 21 U.S.C. Sections §§ 841, 846, and 856 | See attached Affidavit. |

This criminal complaint is based on these facts:

See attached Affidavit.

☐ Continued on the attached sheet.

_Complainant's signature_

Rodolfo Ayala, TFO - ATF
_Printed name and title_

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. 4.1

Date: __2-22-21__

_Judge's signature_

City and state: __Milwaukee, Wisconsin__   Honorable Stephen C. Dries, U.S. Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT AND A CRIMINAL COMPLAINT

I, Deputized ATF Task Force Officer and Milwaukee Police Department Officer Rodolfo Ayala, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint and arrest warrant for Nathaniel WILKE and Zachary WAITE.

2. I am a Police Officer for the Milwaukee Police Department (MPD) and am a state certified law enforcement officer currently assigned to the Milwaukee Police Department's Special Investigations Division-Alcohol, Tobacco, Firearms and Explosives Violent Impact Team, and involved in the investigation of narcotics trafficking as well as individuals prohibited from the possession of firearms.

3. Your affiant has worked full-time as a law enforcement officer for the past eighteen (18) years; and your affiant has been a deputized, full-time Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for the past ten (10) years. Your affiant is currently assigned to the Chicago Field Division-Milwaukee Field Office.

4. Your affiant has received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons. Your affiant has been trained regarding firearm offenses and has arrested individuals for firearms related offenses including both federal and state criminal violations. I have also investigated drug trafficking offenses at the state and federal level and have been involved in arresting individuals who violate the State of Wisconsin and/or the federal narcotics laws included in Title 21 U.S.C. §§ 841 and 846. I have worked with local, state and federal law enforcement agencies, investigating the possession, use, and trafficking of controlled substances and weapons in the State of Wisconsin.

5. Your affiant has participated in the execution of numerous search warrants in which weapons and/or narcotics were seized. Your affiant is familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking.

6. Your affiant is professionally trained in the use of firearms and your affiant has experience working with confidential informants, citizen informants, and other sources of information.

7. Your affiant has received training in the investigations of narcotics to include, but not limited to possession of a controlled substance, possession of a controlled substance with intent to deliver, and the manufacturing/delivering of a controlled substance. Your affiant has recovered and purchased numerous narcotics to include marijuana, cocaine salt, cocaine rock, heroin, oxycodone, and MDMA.

8. Your affiant worked as an undercover police officer in the City of Milwaukee for over four years and made over 100 buys from different drug dealers. Your affiant has conducted over 100 interviews of drug dealers and drug users over the course of your affiant's career. Your affiant has been involved in over 100 investigations where narcotics (marijuana, cocaine, heroin, etc.) were recovered.

9. The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10. Throughout this affidavit, reference will be made to law enforcement. Law enforcement are those federal, state, and local law enforcement officers who have directly

participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

11. Your affiant is currently investigating the involvement of Nathaniel WILKE and Zachary WAITE in the several crimes and is providing this affidavit is support of charges for the following crimes:

    a. Count One: (Nathaniel WILKE and Zachary WAITE) Conspiracy to Distribute Narcotics in violation of Title 21 U.S.C. §§ 841 and 846; and Title 18 U.S.C. § 2(a) from approximately April 2018 to December 18, 2019.

    b. Count Two: (Nathaniel WILKE and Zachary WAITE) Use of Three Firearms in Connection with Narcotics Trafficking in violation of Title 18 U.S.C. §§ 924(c) and 2(a) on December 18, 2019.

    c. Count Three: (Nathaniel WILKE and Zachary WAITE) Possession of Three Firearms and Ammunition by a Prohibited Person, and Aiding and Abetting, on December 18, 2019 in violation of Title 18 U.S.C. §§ 922(g) and 2(a);

    d. Count Four: (Nathaniel WILKE and Zachary WAITE) Conspiracy to Maintain Drug Involved Premises in violation of Title 21 U.S.C. §856 and Title 18 U.S.C. § 2 on or about December 18, 2019.

    e. Count Five: (Nathaniel WILKE) Aiding and Abetting the Knowingly Making of a False Statement(s) to a Licensed Firearm Dealer(s) that was Material to the Lawfulness of a Firearm Sale(s), in violation of Title 18 U.S.C. §§ 924(a)(1)(A) and 2, on or about December 16, 2019;

3

12. Based on the facts set forth in this affidavit, I believe there is probable cause to arrest Nathaniel WILKE and Zachary WAITE and to charge them with the criminal violations described above.

## PROBABLE CAUSE

**Straw Purchases of Firearms for Prohibited Persons**

13. Your affiant knows, from his training and experience that individuals who cannot legally purchase firearms because of previous felony conviction(s) or because they want to distance themselves from the ownership and/or possession of a firearm(s) will often recruit "straw purchasers" to illegally obtain firearm(s) on their behalf. These "straw purchasers" are often complicit with the intent to conceal the identity of the intended recipient of the firearm(s). These types of transactions are commonly conducted for financial gain of the "straw purchaser" or as the result of a relationship (familial/romantic/platonic or economic) between the true purchaser and the straw purchaser. In addition, those who are involved in drug trafficking will also use customers of their illegal narcotics to act as "straw purchasers" for them in exchange for either narcotics, money, or both.

14. When a firearm is recovered by law enforcement, the firearm information is generally submitted for tracing information. This tracing information can help to identify the origin of the firearm. A common indicator of firearm straw purchasing can be the existence of a relatively short time span between the purchase of a firearm and its ultimate recovery by law enforcement during a crime or during a criminal investigation. Under these circumstances, the short "time to crime" serves as an investigative lead.

### Firearms and Narcotics Trafficking

15. Your affiant also knows, from his training and experience, that those involved in narcotics trafficking use firearms to protect their product and themselves from robberies by other drug dealers and/or customers. In addition, drug dealers will often use firearms which are readily available to them or which belong to others working with them. Often, firearms are kept near the narcotics and/or within reach of the traffickers. Your affiant also knows, based on his training and experience that drug dealers will work in tandem in order to maximize their sales and profits. In doing so, they will often share their narcotics, cell phones, as well as their firearms in order to protect their product and territory. Your affiant also knows, from his training and experience, that if a narcotics trafficker is a convicted felon, the narcotics trafficker will often seek out firearms from others and/or will have a non-felon claim the ownership of any firearms recovered by law enforcement.

### Summary of Previous Information Obtained Regarding WILKE and WAITE

16. In late April 2018, Milwaukee Police Department Officers (MPD) conducted an interview of a confidential source of information (SOI). The SOI informed a MPD Officer that a person that they know as Nate "Savage" WILKE was living in the area of S. 9th St. and W. Arthur St. and that WILKE was selling narcotics from a residence in that area. The SOI informed the MPD Officer that they did not know the exact house because the SOI would drive to the area, and park their car at a designated location, at which time WILKE would walk from his residence to the SOI's vehicle to conduct the sale. The SOI further informed the MPD Officer that WILKE would charge $150.00 for an ounce of marijuana and $1,600.00 for a pound of marijuana.

17. Your affiant knows, from his own knowledge of Milwaukee that XXXX S. 9th St. is within the geographic area described by the SOI.

18. The MPD Officer who spoke with the SOI was very familiar with WILKE due to his investigations in the south side of Milwaukee and knows him to be a tall male, in his 30's, who appears to be of Native American decent and has long hair, which WILKE often wears in a ponytail. MPD records also identify WILKE as having the nick name of "Savage."

19. When the SOI was shown a booking photograph of WILKE the SOI confirmed WILKE's identity as being that of the person he had earlier identified as being involved in the sale of narcotics.

20. In the early to mid-part of December 2019, the same MPD Officer conducted an interview of a confidential Informant (CI). This CI stated that they have been inside of a house, located at XXXX S. 9th St., #upper, and have observed a subject they described as a Native American male, in his early 30's very tall, with a thin build and very long hair selling marijuana from that location. They stated that another subject sold cocaine from the same residence and that both were living in the upper and were affiliated with the occupants of the lower who also sold narcotics. This CI positively identified WILKE by photograph as the subject they observed selling marijuana from the residence. That CI further informed the MPD Officer that there were multiple subjects inside of the residence located at XXXX S. 9th St., #upper, who were selling narcotics.

21. The same MPD Officer conducted undercover surveillance on December 16, 2019 of XXXX S. 9th St., #upper, and observed the person he knows as WILKE and a subject later identified as Zachary M. WAITE, at the location. The MPD Officer observed WILKE walk from his residence and walk to a dark colored Chevrolet SUV. WILKE then entered the driver's side of the vehicle and drove the vehicle south on S. 9th St., and then drove east on W. Arthur. After a short while, the MPD Officer observed WILKE walking from the direction he last observed the

6

dark colored vehicle and come through the gangway to the front of the house and enter the address XXXX S 9th St., #upper.

22. In addition, the MPD Officer, after seeing WILKE return to the upper, observed WILKE come out of XXXX S 9th St., #upper, on several other occasions on that date. He observed WILKE go from the residence to different cars that drove up nearby. The Officer observed that the cars kept their engine running and, once WILKE would reach the car, WLKE would sit in the passenger seat and would stay a very short period of time, followed by WILKE getting out of the car, and the car would then drive away. The MPD Officer, who is familiar with the methods used to sell narcotics in Milwaukee, identified the conduct as being consist with narcotics trafficking.

23. Your affiant also knows, from his training and experience, that this this type of behavior is consistent with WILKE selling narcotics to customers who have driven up to make a quick purchase of narcotics.

24. On December 18, 2019, two days after the officer's observations of WILKE, a state search warrant was obtained for the address.

**December 18, 2019 Search of the Upper Unit**

25. Your affiant is aware that on December 18, 2019, officers from the Milwaukee Police Department executed a search warrant at XXXX S. 9th Street, upper, in Milwaukee, WI, the residence described above.

      a. **XXXX S. 9th Street, Upper is an Active Drug House**

26. A search of the upper unit revealed that both firearms and narcotics were present in the unit. Located in the upper unit were five adult individuals, including both Nathaniel WILKE and Zachary WAITE. The upper unit had several indicators of being an active drug house which your affiant recognized based on his training and experience. For example, it was scantly

7

furnished, had no real beds, and only had mattresses on the floor for sleeping. In addition, the kitchen rather than being filled with food, instead had a digital scale with drug residue on it on the kitchen counter. The kitchen cabinets where fully equipped for the "business" of drug trafficking, including digital scales, bags of cocaine, large glass jars that had marijuana residue on them, and packaging materials commonly used to package narcotics, including baggies.

        **b.**        **Three Loaded Firearms Recovered in the Kitchen**

27. Significantly, in one of the kitchen cabinets, located within 3 feet of where some of the narcotics was found to have three firearms on top of it. All three firearms were placed together above the cabinet and secreted behind dry food items. All three firearms were loaded. With the firearms was additional ammunition including a bag full of ammunition and an additional box of ammunition. None of the firearms were in gun boxes and they all appeared ready to be used. I know from my training and experience that those involved in narcotics trafficking use firearms to protect their product and themselves from robberies by other drug dealers and/or customers. In addition, drug dealers will place the firearms in locations that are readily available to them. Often, firearms are kept near the narcotics and/or within the reach of the traffickers. Your affiant also knows, from his training and experience, that if a narcotics trafficker is a convicted felon, the narcotics trafficker will often seek out firearms from others, use a "straw purchaser" to obtain a firearm, and/or will have a non-felon claim the ownership of any firearms recovered by law enforcement so as to protect the felon.

        **c.**        **WILKE and WAITE Controlled and Ran the Drug House**

28. Upon entering the residence, the MPD Officer observed WILKE sitting in the living room of the house. The MPD Officer also observed two young children in the residence and law enforcement was able to identify the children as being WILKE's children. The MPD Officer

8

observed that WILKE was in the residence wearing a t-shirt and athletic shorts. As it was the middle of December, WILKE was not dressed in the manner a visitor would dress for the weather, rather, if he was dressed for staying indoors, and for comfort, consistent with this residence being a place he resided and/or planned to remain for long periods of time without going outdoors. During the search warrant, someone came to the residence to take WILKE's two children out of the house, both of whom were under the age of 4 years old. When law enforcement first entered, one of WILKE's children had an accident and urinated on themselves, soiling their clothing. WILKE instructed MPD to go into the north central bedroom to retrieve clothing for both children; and law enforcement in fact located children's clothing in the room identified by WILKE. Further investigation led officers to believe that this was the room WILKE used as his bedroom when at this house.

29. The MPD officers observed that the room identified by WILKE was near the kitchen, and it had no real beds; rather, it did have two mattresses, stacked on top of each other on the floor, for sleeping. Officers observed that the room contained some furniture and personal effects used for hygiene, as well as additional clothing, some being for a male and others being children's clothing. Officers conducted a search of that bedroom and observed WILKE's wallet with several of his identification cards bearing WILKE's name. Found in the wallet was a VISA card and a Wisconsin driver's license, both bearing WILKE's name. Officers also observed, a digital scale with marijuana on it, and a large amount of marijuana (approximately 5 ounces in different forms, some of which was lose and some of it was in pre-packaged containers) located on top of the dresser. In addition, over a pound of marijuana was found in that room. Also, on top of the dresser was a large gallon-sized zip lock bag that had approximately one ounce of marijuana in it, as well as 4-cylinder jars containing specialty marijuana sold in some out-of-state

9

dispensaries, as well as a stack of money. Among other items found in this bedroom, law enforcement located a photograph of WILKE and a piece of mail addressed to WILKE. Also, when WILKE was being taken into custody, he directed officers to that same bedroom to retrieve pants for him to wear out of the house. A record check for WILKE revealed that he is a convicted felon, and thus cannot possess any firearms.

30. Upon entry, officers also located Zachary M. WAITE inside of the residence. WAITE informed officers that he lived at the location. The front bedroom was identified as being Zachary WAITE's room and it was scantly furnished and included a mattress on the floor and a fan, with virtually no other furniture in the room. The closet was devoid of clothing and the only other clothing was strewn throughout the room.

31. The MPD Officer conducted a search of WAITE's person and located a clear plastic sandwich bag that had 5 "gem pack" style small plastic baggies in it each containing a tannish brown substance in it, suspected to be heroin. I know from my training and experience that such packages are usually premade- so as to make it easier to sell a specific amount of heroin to others. The Officer continued the search of WAITE and located two keys tied on an orange shoelace hanging from WAITE's neck. Officers took note that the keys worked for the two locks of the front door.

32. Officers also found in the residence several parcels of mail in WAITE's name, and a debit card with WAITE's name listed on it. WAITE further identified clothes in the living room as clothing belonging to him. Also found was a prescription bottle in WAITE's name in the living room area.

33. Officers continued to search and located several additional containers filled with a green leafy plant like substance suspected to be marijuana. Officers also located several clear

10

plastic sandwich bags that housed both a white and off-white chunky substance, suspected to be cocaine and "crack" cocaine, respectively.

34. Officers located several digital scales, several empty clear plastic sandwich bags with the corners missing from them, as well as several more boxes of open and unopened clear plastic sandwich bags. Your affiant knows from his training and experience that "corner-cut" bags are routinely used for the packaging of narcotics for resale. In addition, the officers noted that one of the scales had what appeared to be cocaine residue on it and another had what appeared to be marijuana residue on it.

35. Officers subjected some of the suspected marijuana to Narc II 05 field test at which time it tested positive and weighed a total of 469.58 Grams. Officers subjected some of the suspected "crack" cocaine to Narc II 07 field test at which time it tested positive for cocaine base and weighed a total of 3.43 grams. Officers subjected some of the suspected cocaine to Narc II 07 field test at which time it tested positive for cocaine mixed with Fentanyl and weighed a total of 81.93 grams. Officers subjected the suspected heroin to Narc II 11 field test at which time it tested positive for opiates and weighed 0.82grams.

36. Officers continued to search the kitchen and located a cabinet with a clear plastic sandwich bag that contained over 23.79 grams of a white powdery substance suspected to be cocaine. That cocaine was later tested and tested positive for cocaine and fentanyl. Also found in that cabinet were additional identifiers for WAITE, several corner-cut bags, scales, and other drug paraphernalia consisted with the selling of narcotics.

37. Your affiant estimates, based on his knowledge and experience, that the value of the narcotics recovered in the upper was at least $10,000.

### d. The Firearms Were Used in Furtherance of Drug Trafficking

38. The firearms recovered from above the kitchen cabinet, identified in paragraph 26 above, are further described as follows:

   a. a Black Glock, model #17 Gen 5, 9mm (serial #BLNL542) pistol,

   b. a Black Walther, model #Creed, 9mm (serial #FC05054) pistol, and

   c. a Black Springfield, model #Hellcat, 9mm (serial #AT263940) pistol ("the Springfield Hellcat, 9mm" herein).

39. Your affiant, after tracing these firearms, has determined that all three of the above firearms were purchased by individuals other than WILKE or WAITE, and that they were all purchased within three months of the search warrant.

40. In addition, your affiant has been told by fellow ATF Special Agents that the above three firearms are firearms not manufactured in the State of Wisconsin; therefore, these firearms traveled in interstate commerce prior to being recovered by law enforcement on December 18, 2019.

41. When investigating the Springfield Hellcat, 9mm recovered inside of the residence XXXX S 9th St., upper, law enforcement realized that the paperwork for that firearm was also located in part of the residence being searched on December 18, 2019. Upon review of this paperwork, officers determined that this firearm was purchased on Monday, December 16, 2019, just two days prior to the search warrant.

42. The gun box for the same Springfield Hellcat, 9mm was also recovered in the residence. The box for this firearm contained a magazine, paper targets, a gun lock, and a soft case. Also recovered on the ground in the rear entryway was paperwork from "Select Fire Weaponry" for the same Springfield Hellcat, 9mm handgun. The paperwork recovered revealed that it had

12

Case 2:21-cr-00062-BHL   Filed 02/22/21   Page 13 of 17   Document 1

been filled out on December 16, 2019, by an individual law enforcement believe was a straw purchaser ("straw purchaser-1"). "Straw purchaser-1" was not in the residence at the time of the search.

**WAITE's Post Arrest Statement**

43. Your Affiant is aware that after the search warrant on December 18, 2019 officers conducted a Mirandized interview of Zachary WAITE. According to the MPD information, Zachary WAITE waived his constitutional rights and agreed to make a recorded statement after his arrest. In the recorded statement Zachary WATIE admitted that he did rent the residence located at XXXX 9th St. upper. Zachary WAITE stated that he owned the narcotics inside of the residence and that he sells narcotics from XXXX S. 9th St, upper. Zachary WAITE also stated that he owned the firearms that are in the residence and also possesses them in the residence along with the narcotics. Zachary WAITE would not implicate anyone else in the organized narcotics ring but alluded to others involvement on several occasions. In addition, he stated, in substance that he did not want to implicate WILKE as WILKE has young children.

**The December 16, 2019 Straw Purchase for WILKE**

44. As part of this investigation, law enforcement learned that "straw purchaser-1" knew both WILKE and WAITE and, that at the time "straw purchaser-1" bought the firearm, "straw purchaser-1" was a self-admitted heroin addict. Moreover, your affiant learned that one of locations "straw purchaser-1" used to obtain heroin during that time was the drug house run by WILKE and WAITE. Based on my knowledge and experience I know that drug dealers will often recruit a customer to be a straw purchaser for them in exchange for money and/or narcotics.

45. Based on my knowledge and experience your affiant believes that the short "time to crime" between the date the firearm was purchased and the fact that it was recovered in a drug house is also indicative of "straw purchaser-1" being the straw purchaser of that firearm.

46. On December 20, 2019, your affiant contacted the FFL (Select Fire Weaponry) that sold the Springfield Hellcat, 9mm to "straw purchaser-1." The FFL provided your affiant with a copy of the surveillance video from the date of the sale.

47. Your affiant reviewed the video and observed that "straw purchaser-1", on December 16, 2019, arrived at the gun store in a black Chevy SUV. A short time later a second subject exited the same black Chevy SUV and entered the business. Your affiant positively identified the second subject as Nathaniel WILKE. Also, although both were in the store at the same time, they never appeared to interact with each other. I know from my training and experience that those who use straw purchasers will often insist on being present at the time of the sale to the straw purchaser so as to protect their money and to make sure the true purchaser actually receives the firearm after the purchase. I also know that, generally, if the true purchaser accompanies the straw purchaser, the true purchaser will try to mask his relationship to the straw purchaser and act as if the two are unknown to each other. Therefore, your affiant's observations of "straw purchaser-1" and WILKE arriving in the same car, and both being present while purchasing the firearm is consistent with it being a straw purchase for WILKE. The gun store video was time-stamped with the date December 16, 2019 and a time of 1:45pm; this date and time would place the sale, just prior to the time the MPD Officer was conducting the surveillance of WILKE and WAITE and their drug house.

14

Cell Phone Provides Evidence of Wilke as a Drug Trafficker

48. Several cell phones were recovered during the December 18, 2019 search warrant and search warrants were obtained for the recovered cell phones. Your affiant knows that cell phones may contain relevant evidence including communication and images of individuals selling narcotics, and/or maintaining drug houses, and, among other uses, cell phones may be used by narcotics traffickers to contact customers and/or to alert them when the drug house has narcotics for sale.

49. One of the phones searched contained a video which depicted WILKE with another individual who was also present at the time of the search warrant on December 18, 2019. This video was reviewed by one of the officers involved in the December 18, 2019 search warrant at XXXX S. 9th, upper. That officer identified the location depicted in the video as being the same location that was searched on December 18, 2019, i.e. XXXX S. 9th, upper.

50. This video, in substance, portrayed WILKE and the other individual, at the residence located at XXXX S. 9th, upper, and identified the date of the video as being July 4, 2019. During the video WILKE's voice can be heard and WILKE can be seen as he is talking and walking from the rear of the house to the front of XXXX S 9th St, upper.

51. Your affiant also has compared the furniture and the rooms portrayed in the video and has determined that the furniture and the layout was consistent with the rooms and locations photographed at the search warrant on December 18, 2019 at XXXX S. 9th, upper.

52. In addition, the same cell phone contained numerous images of large amounts of marijuana, including marijuana usually sold in dispensaries in states that allow the sale of marijuana. I know from my training and experience that one of the methods used by narcotics

15

traffickers to advertise the narcotics they have for sale is to photograph or film a new shipment so as to alert customers that the narcotics are available.

53. Similarly, in yet another video recovered from the same cell phone, your affiant observed images of several packages of an oil-like substance in a red and clear plastic glass container which was in a "Louis Vuitton Supreme" brand packaging. Your affiant knows from his training and experience that the appearance of that substance is consistent with marijuana products sold by drug traffickers. The packaging also had multiple other similar packages rubber-banded together. Your affiant knows from his training and experience that the packages in the video are consistent with the format marijuana is sold in dispensaries in states that allow the sale of marijuana. Also, your affiant observed that the packages had the following words printed on them: "90% THC," "Clear THC," "Pesticide Free," "No Additives," and "Lab Tested." The number of packages depicted in the video is consistent with distribution amounts of narcotics.

54. Also, during the review of the video, your affiant heard a voice, believed to be that of WILKE, and WILKE is heard laughing in the background and stating, "That's the fucking (inaudible)." Next, another voice is heard, believed to be that of the operator of the camera, and that voice speaks over WILKE's voice and is heard saying: "The real deal Holyfield." A few seconds later, WILKE's head can be observed in the video and WILKE yelled, "These are exclusive." Your affiant believes that these images and videos were made to advertise to customers the availability of specialty types of marijuana for sale at XXXX S. 9th, upper by WILKE and others.

**AUTHORIZATION REQUEST**

Based on the foregoing, I request that the Court issue the proposed arrest warrant based on the criminal complaint and affidavit submitted.

16

Case 2:21-cr-00062-BHL   Filed 02/22/21   Page 17 of 17   Document 1